UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


ADAM W. DAVIS,

        Petitioner,

v.                                   Case No. 8:08-cv-1842-T-33MAP

**DEATH CASE**

SECRETARY DEPARTMENT OF CORRECTIONS,

        Respondent.

_____/

## O R D E R

      Adam W. Davis, a Florida prisoner under sentence of death, petitions for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. Davis proceeds on his timely-filed amended petition (Doc. No. 14) (the "petition" or "Am. Petition"). Because Adams was tried and sentenced in Hillsborough County, Florida, venue properly lies in the Middle District of Florida.

      The issues are fully briefed and the case is ripe for decision. No evidentiary hearing is necessary because the record is fully developed and the claims of the petition raise issues of law, not issues of fact. *See Breedlove v. Moore*, 279 F.3d 952, 959 (11th Cir. 2002).[1]

---

[1] The trial court conducted an evidentiary hearing. Its findings are "presumed to be correct" (28 U.S.C. § 2254(e)(1)) and there is no showing that its decision "was based on an unreasonable
(continued...)

Because of the deference due the state courts' findings of fact and conclusions of law, the state courts' determination of Davis's claims largely governs review of those same claims. Consequently, in determining the reasonableness of the state courts' determinations, the review of Davis's claims includes a recitation of the pertinent state court analysis.

## FACTUAL BACKGROUND

Petitioner Adam Davis was convicted and sentenced to death for the 1998 murder of Vicki Robinson. In its opinion affirming the conviction and sentence, the Florida Supreme Court set out the facts of the case:

> The evidence presented during Davis's trial revealed the following facts surrounding this case. Prior to June 26, 1998, Davis had been seeing Valessa Robinson, then fifteen years old, for about nine months. Valessa was a troubled teen who had repeatedly run away from home and lived with her mother, Vicki Robinson, who was divorced. In 1997, Ms. Robinson had Valessa evaluated pursuant to the Baker Act.

> On June 26, 1998, Davis, then nineteen years old, spent the day running errands with Valessa, Ms. Robinson, and Davis's friend, Jon Whispel. Later that evening, Ms. Robinson had dinner at her house with a friend, Jim Englert. At approximately 11:20 p.m., Davis, Valessa, and Whispel arrived at Ms. Robinson's home. Upon entering, the trio went straight to Valessa's bedroom. Shortly thereafter, Mr. Englert decided to go home, and he inquired if Davis and Whispel needed a ride home. Davis and Whispel declined the offer. They subsequently left on their bicycles and went to Denny's Restaurant, located at Stall Road and Dale Mabry in Tampa. Valessa later snuck [sic] out of her house and met Davis and Whispel at Denny's.

> Upon Valessa's arrival, the three left Denny's to acquire LSD. They consumed the acid, returned to Denny's, and pondered what they wanted to do next. As they sat at the table, Valessa stated that the three should kill her

---

[1](...continued)
determination of the facts. . . . " (28 U.S.C. § 2254(d)(2)).

mother. Although Whispel at first thought Valessa was joking, Davis and Valessa began to discuss ways in which they could kill Ms. Robinson. Davis ultimately suggested that they inject Ms. Robinson with enough heroin to cause an overdose.

The three left Denny's and headed back to Ms. Robinson's house. When they arrived, they stayed outside for a while to ensure that they did not awaken Ms. Robinson. Whispel and Valessa then went inside the house and opened the garage door. Upon returning to the outside, they waited again to ensure Ms. Robinson did not awaken. Valessa then opened the keyless entry to her mother's van and retrieved the set of spare keys. Davis put the car into neutral, and Valessa and Whispel pushed the car out into the street so as not to awake Ms. Robinson.

Davis then drove the trio to a friend's house to purchase the heroin. While inside his friend's house, Davis told his friend that he was looking for enough heroin to kill someone and make it look like an accident. Although Davis was unable to obtain any heroin, he did purchase a syringe.

Davis, Whispel, and Valessa returned to Ms. Robinson's home and parked several houses down the street to avoid waking Ms. Robinson. Once inside the home, Davis suggested that Valessa get some bleach and a glass so that they could inject Ms. Robinson with bleach and an air bubble using the syringe he had purchased. Valessa complied. Davis then filled the syringe with bleach and air, grabbed his folding knife, and he and Valessa headed to Ms. Robinson's bedroom. A few minutes later, Davis and Valessa returned, stating that Ms. Robinson had awakened. Davis put the syringe and the bottle of bleach in Valessa's closet and put his knife on Valessa's dresser. Ms. Robinson knocked on the door and told Valessa to get her sleeping bag and come into her room. Davis handed Valessa her sleeping bag, and Davis followed Ms. Robinson into the hall.

Davis put Ms. Robinson into a "sleeper" hold, attempting to render her unconscious. He then asked for the syringe. Because Valessa did not know where Davis had put the syringe, Davis told Valessa to hold her mother down while he retrieved it. Davis then returned and injected Ms. Robinson with the bleach-filled syringe. While this was happening, Whispel testified that Ms. Robinson was fighting to get up and asking what they were doing to her. A few minutes later, Davis stated that the bleach was not working. At that time, Whispel brought Davis the knife and said "use this." Whispel then returned to Valessa's bedroom. When Davis and Valessa returned to Valessa's bedroom, Davis was holding the knife limply in his left hand, and Whispel noticed blood

on Davis's hands and on the knife. Valessa did not appear to have blood on her hands.

Shortly thereafter, the three heard moaning from the kitchen, where the incident had occurred, and Davis commented that Ms. Robinson would not die. Davis then grabbed the knife and left the room. Davis later told Whispel that he stabbed Ms. Robinson two more times and tried to break her neck.

A few hours later, Davis, Whispel, and Valessa cleaned the kitchen with bleach and towels. Davis put Ms. Robinson into a trash can that he had retrieved from the garage. The three loaded Ms. Robinson's van with the towels, the trash can, shovels and a hoe, and drove to a wooded area near Ms. Robinson's home to bury Ms. Robinson. While digging the hole, however, they hit rough terrain, so they instead concealed the trash can with some foliage, planning to come back later.

The three eventually returned to Ms. Robinson's house and obtained Ms. Robinson's credit cards, cash, and ATM card because Valessa knew the personal identification number. Davis, Whispel, and Valessa spent the next three days in Ybor City, using Ms. Robinson's money to get tattoos and stay at motels. They also went to Home Depot and purchased twenty bags of concrete, a bucket, and a trash can, with the intention of dumping the body in a nearby canal.

During the time that the three were in Ybor City, Mr. Englert reported that Ms. Robinson was missing. Davis subsequently learned from a friend that he and Valessa were on the news, so the three decided to go to Phoenix, Arizona. Because they needed to leave quickly, they did not complete their plans with regard to Ms. Robinson's body.

Davis, Whispel, and Valessa remained on or near Interstate 10 during their trip and continued to use Ms. Robinson's ATM card. Upon being notified by the police that Ms. Robinson was missing, Ms. Robinson's credit union began to track the card's usage, as opposed to closing her account. The three were ultimately traced to near Pecos County, Texas, where, after a high-speed chase, they were apprehended. Valessa was taken to a juvenile detention center near Midland, Texas, and Whispel and Davis were taken to Fort Stockton.

Lieutenant John Marsicano and Detective James Iverson, who had been investigating the case in Hillsborough County, arrived in Texas early in the morning on July 3, 1998, the day after Davis, Whispel, and Valessa had been arrested. Because Valessa was being detained closer to the airport, the

officers questioned her first. They then drove to Fort Stockton to question Whispel and Davis. In Fort Stockton, the officers first interviewed Whispel. Davis was subsequently questioned around 5:30 a.m. The officers spoke with Davis for approximately eight to ten minutes. The officers then administered Davis's *Miranda* warnings, [n1] obtained a signed written waiver of rights form, and had Davis draw a map indicating where Ms. Robinson's body could be found. At that time, the officers turned on their tape recorder and recorded a confession from Davis. During his confession, Davis described how the murder was planned and committed, including how he had stabbed Ms. Robinson. He also described their activities following Ms. Robinson's death.

> [n1] *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

*Davis v. State*, 859 So. 2d 465, 468-70 (Fla. 2003).

## PROCEDURAL HISTORY

Prior to trial, an evidentiary hearing was conducted on a motion to suppress the statements that Davis provided to two Hillsborough County, Florida detectives in Texas; both detectives and Davis testified at the suppression hearing. (App. A15/1446-1540).[2] Following the hearing, the state trial court judge denied the motion to suppress (App. A15/1540).

Davis's trial was held in November 1999. (App. A11-A13). The jury convicted Davis of first-degree murder, grand theft, and grand theft of an automobile. At the penalty phase, three witnesses read prepared victim impact statements, and the State presented certified copies of prior convictions and sentences, reflecting that Davis was on felony probation at the time of the murder (App. A14/1303-1314, 1368). Davis presented background evidence

---

[2] Respondent filed the state court record in two appendices (App. A1-A30 and B1-B30), which consist of the records, appellate briefs, and court opinions generated in all state proceedings related to Davis's custody as challenged in his petition. References to the state court record will cite to the appropriate exhibit and page number within each appendix.

from a clinical psychologist, Dr. Michael Gamache, and testimony from an aunt (Carolyn Clark), a step-aunt (Carol Elliot), a friend (Patricia Duffy), a counselor from a foster group home (Richard Barron), and Davis's biological mother (Tamara Elliot). (App. A14/1316, 1344, 1347, 1355, 1357, 1364). The jury was also aware that co-defendant Jon Whispel had pled guilty to second degree murder, grand theft, and grand theft auto, receiving a sentence of twenty-five years, and that co-defendant Valessa Robinson was too young to be eligible for the death penalty.[3]  (App. A11/834-35, 876; A14/1378).

By a seven-to-five vote, the jury recommended that Davis be sentenced to death. The state trial court followed the jury's recommendation and imposed a death sentence on December 17, 1999, finding **three aggravating factors**: (1) the crime was committed while Davis was on felony probation; (2) the crime was heinous, atrocious, or cruel; and (3) the crime was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification; **one statutory mitigating factor**, (Davis's age [19] at the time of the crime (little weight)); and **four nonstatutory mitigating factors**: (1) Davis was under the influence of LSD at the time of the offense (some weight); (2) Davis had no prior convictions for assaultive behavior (some weight); (3) Davis had a deprived childhood and suffered hardships during his youth (some weight); and (4) Davis is a skilled writer and artist and could be expected to make a contribution to the prison community by sharing his knowledge, skills, and experience (some weight). (App. A4/636-643).

---

[3] After Davis's trial and sentencing, Valessa was convicted of third degree murder and grand theft auto.  *Robinson v. State*, 827 So. 2d 997 (Fla. 2d DCA 2002).

Davis appealed, raising the following issues: (1) the trial court erred by denying Davis's motion to suppress statements that he made to the Hillsborough County detectives during his interview in Texas; (2) the trial court erred by denying Davis's motions to strike venirepersons for cause; (3) the trial court erred by excluding the confession of codefendant Valessa Robinson; (4) the trial court erred by admitting an autopsy photograph of Ms. Robinson; (5) the trial court erred by refusing to specifically instruct the jury that the disproportionate sentences received by Davis, Whispel, and Valessa Robinson may be considered as a mitigating factor; (6) the trial court erred by finding the heinous, atrocious, or cruel aggravating factor; (7) the trial court erred by finding the cold, calculated, and premeditated aggravating factor; (8) imposing a death sentence grounded on a bare majority of the jury's vote is unconstitutional; and (9) Florida's death penalty scheme is unconstitutional.

The Florida Supreme Court affirmed the convictions and sentences on September 11, 2003 (App. A26); *Davis v. State*, 859 So. 2d 465 (Fla. 2003). (See Appendix A which contains the Florida Supreme Court's ruling on each claim).

**Davis timely filed the present 28 U.S.C. § 2254 petition for writ of habeas corpus**. **A review of the record demonstrates that, for the following reasons, the petition must be denied.**

### STANDARD OF REVIEW

Davis alleges fifteen separate grounds for relief. Because Davis filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Penry v. Johnson*, 532 U.S. 782, 792

(2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003); *Maharaj v. Sec'y Dept. of Corrections*, 304 F.3d 1345, 1346 (11th Cir. 2002).

The ultimate issue with respect to each claim is whether the Florida Supreme Court's resolution of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

*Price v. Vincent*, 123 S.Ct. 1848, 1852-53 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000); *Clark v. Crosby*, 335 F.3d 1303, 1308 (11th Cir. 2003); *Robinson v. Moore*, 300 F.3d 1320 (11th Cir. 2002); *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318 (11th Cir. 2002); *Harrell v. Butterworth*, 251 F.3d 926, 930 (11th Cir. 2001). Davis must show not merely that the state courts "got it wrong," but that the result is objectively unreasonable. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor, supra*). If no Supreme Court precedent controls or if applicable precedent is ambiguous, no "clearly established" precedent contravenes the state court's conclusion. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Clark v. Crosby*, 335 F.3d 1303, 1308-10 (11th Cir. 2003); *Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003).

A factual finding by a state court is presumed correct, and the petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Henderson*, 353 F.3d at 890-91. The statutory presumption of correctness applies only to

- 8 -

the state court's finding of fact and not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).

Procedural Default

Only two narrow circumstances excuse a procedural default. First, the petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both cause for the default and actual prejudice resulting from the default. Cause ordinarily requires a petitioner to demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court. *Henderson v. Campbell*, 353 F.3d at 892; *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995). To show prejudice, a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his factual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). The petitioner must show at least a reasonable probability that the result of the proceeding would have been different. *Henderson v. Campbell*, 353 F.3d at 892.

Second, a petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Henderson v. Campbell*, 353 F.3d at 892. This exception is available only "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Henderson v. Campbell*, 353 F.3d at 892. The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence

rather than his "legal" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (2001) (citing *Calderon v. Thompson*, 523 U.S. 538, 559 (1998); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986) (explaining that a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent"). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, " '[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon*, 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324) (explaining that "[g]iven the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected") (internal quotation marks omitted). *Schlup* states that the petitioner must show constitutional error coupled with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup,* 513 U.S. at 324.

<u>State Law Claims</u>

Generally, a claim alleging a violation of state law is not subject to review by a petition for the writ of habeas corpus. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *McCullough v. Singletary*, 967 F.2d 530, 535-36 (11th Cir.1992). To the extent raised in a federal habeas petition, a federal question is not exhausted in state court if raised in state court only as a state law claim. *Anderson v. Harless*, 459 U.S. 4, 6-8 (1982). A federal claim not "fairly presented" to a state court is procedurally defaulted for federal habeas purposes. *Baldwin v. Reese*, 541 U.S. 27 (2004).

### Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of trial counsel, a petitioner must meet the two-part test in *Strickland v. Washington*, 466 U.S. 668 (1984). See Heath v. Jones, 941 F.2d 1126, 1130 (11th Cir. 1991), cert. denied, 502 U.S. 1077 (1992). *Strickland's* two-part test requires a petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 941 F.2d at 1130. However, if a claim fails to satisfy the prejudice component, the court need not rule on the performance component. *Bolender v. Singletary*, 16 F. 3d 1547, 1556-57 (11th Cir. 1994), clarifies that in order to obtain the reversal of a conviction of a death sentence on ineffective assistance of counsel grounds, a petitioner must show both (1) that the identified act or omission of counsel was either deficient or outside the wide range of professionally competent assistance and (2) that the deficient performance prejudiced the defense such that, without the error, a reasonable probability exists that the balance of aggravating and mitigating circumstances would have differed.

### *Brecht v. Abrahamson*

Finally, if constitutional error occurred, the applicable harmless error standard is enunciated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which is "less onerous" than the harmless error standard in *Chapman v. California*, 386 U.S. 18 (1967). "The test is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can

establish that it resulted in 'actual prejudice.' " *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## DISCUSSION

### Ground One

**INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE TO PRESENT EXPERT AT HEARING ON MOTION TO SUPPRESS STATEMENTS.**

Davis initially asserts that his trial attorneys failed to provide constitutionally effective assistance of counsel by failing to present a mental health expert at the pretrial hearing on the motion to suppress statements Davis made to the Hillsborough County detectives in Texas. Am. Petition, pp. 7- 13; Memo, pp. 6-8. The federal constitutional claim raised in ground one was exhausted in state court. It was subject to an evidentiary hearing in postconviction proceedings; was denied on the merits; and the denial of relief was affirmed on appeal. See App. B23, pp. 16-23 (Issue I in postconviction appeal); *Davis v. State*, 990 So. 2d 459, 463-64 (Fla. 2008).

No habeas relief is warranted on this issue. Under AEDPA, this Court's review of a state ruling on the merits of a federal constitutional claim is highly restricted; Davis must show that the state court decision is either "contrary to" or an "unreasonable application" of established federal law. 28 U.S.C. §2254(d)(1); *Williams*, 529 U.S. at 405-410. The established federal law on a claim of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). *Williams*, 529 U.S. at 416; *Putman,* 268 F.3d 1223, 1241 (11th Cir. 2001).

Under Strickland, a defendant must show that his lawyer's performance fell below an objective standard of reasonableness, and that the deficient performance prejudiced the defendant; that is, that there is a reasonable probability that the outcome of the case would have been different if the lawyer had provided adequate assistance. *Van Poyck v. Florida Dept. of Corrections*, 290 F.3d 1318 (11th Cir. 2002); *Chandler v. United States*, 218 F.3d 1305, 1313-1315 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001).

Proper analysis of this claim requires a court to eliminate the distorting effects of hindsight and evaluate the performance from counsel's perspective at the time, and to indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment; the burden is on the defendant to show otherwise. *Strickland*, 466 U.S. at 689. Where the record is incomplete or unclear about counsel's actions, counsel must be afforded the presumption that he performed competently. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986); *Chandler*, 218 F.3d at 1361 n.15. Here, however, the record is clear that counsel's performance was reasonable.

The Florida Supreme Court rejected this claim as follows:

> In Davis's first claim, he argues that his counsel was ineffective for failing to present expert testimony during the suppression hearing. Davis argues that testimony such as that given by his postconviction experts, Dr. Robert Lee Smith and Dr. Janice Stevenson, established that Davis did not knowingly and voluntarily waive his rights or give his confession to the officers in Texas. Specifically, Davis argues that his experts' testimony established that the coercive combination of sleep deprivation, physical abuse, Davis's age, and Davis [sic] being under the influence of LSD made his confession involuntary. Because his confession was not voluntarily given, Davis argues that it should have been suppressed and that trial counsel was ineffective for failing to call an expert to achieve this result.

The postconviction court denied this claim based on a review of the testimony from the evidentiary hearing and explained:

> The experts' testimony presented at the evidentiary hearing fails to support the argument that Mr. Traina's decision to not have an expert for his motion to suppress was deficient. Dr. Smith testified that [Davis] could have had perceptual distortions [from his use of LSD] that could have affected his ability to understand *Miranda* warnings; however, [Dr. Smith] could not explain those distortions. Additionally, Dr. Smith testified that sleep deprivation could have significantly diminished [Davis's] ability to knowingly waive his rights; however, Dr. Smith also admitted that he did not know how much sleep [Davis] had had. Dr. Smith also testified that the effects of LSD generally last for twelve hours, but law enforcement interviewed [Davis] approximately fifteen hours after his arrest. Unless [Davis] consumed LSD while in police custody, he would no longer have felt the effects of LSD when law enforcement interviewed him. Dr. Stevenson testified that [Davis] was at the "mercy of his impulses and his emotions and unable to make a clear and conscious decision" and that he made his confession "so that he wouldn't be alone." However, the fear of being alone does not negate one's ability to comprehend and knowingly waive *Miranda* rights.

*State v. Davis*, Case No. 98-CF-011873 (Fla. 13th Cir. Ct. order filed June 21, 2006) (Postconviction Order) at 8. Further, the postconviction court found that Davis had not demonstrated prejudice even if his counsel's performance was in fact deficient, stating:

> If Davis's confession had been suppressed, there is no reasonable probability that the results of [his] trial would have been different. *See Wainwright v. State,* 896 So. 2d 695, 700 (Fla. 2004) [(finding no prejudice because in addition to defendant's confession to police, State introduced defendant's confession to two inmates and DNA evidence linking defendant to crime)]. At [Davis's] trial, the State presented the testimony of . . . Jon Whispel, who was present during Vicki Robinson's murder. Additionally, Leanna Hayes, an inmate who was transported back to Florida with Defendant after his arrest, testified at [Davis's] trial that while they were being transported, he told her he had "'cut her up' meaning the lady he killed."

Postconviction Order at 8-9 (record citations omitted). We affirm the postconviction court's denial of relief on this claim.

Davis first alleges that his trial counsel should have presented an expert to testify as to the coercive effects that sleep deprivation and physical abuse had on him. However, we find no error in the postconviction court's determination that Davis was not entitled to relief on these claims. The two officers who interviewed Davis testified that he appeared coherent and not tired. Accordingly, we affirm the postconviction court's denial of relief on these claims.

Next, Davis alleges that counsel should have presented an expert to testify as to the coercive effect of his age, nineteen. To the very limited extent that Davis's experts addressed his age, we find no error in the postconviction court's declining to find counsel ineffective for not arguing that Davis's age of nineteen rendered his confession involuntary. We affirm the denial of this claim.

Finally, Davis argues that his counsel should have presented an expert to testify as to the effects his LSD use had on giving the confession. However, the testimony at the postconviction hearing does not support Davis's claim that he was under the effects of LSD. The postconviction court found that "law enforcement interviewed [Davis] approximately fifteen hours after his arrest." Postconviction Order at 8. This finding is supported by competent, substantial evidence, as both Detective Iverson and trial counsel Traina testified that Davis had been in jail for approximately fifteen hours before his interview. Dr. Smith, however, testified that the effects of LSD generally last only twelve hours. Thus, the testimony of Davis's LSD expert failed to support Davis's claim that he was under the effects of LSD when he was questioned. Because Davis has not demonstrated that he was under the effects of LSD at his confession, he did not establish that LSD had a coercive impact on his confession or that counsel was deficient in declining to call an expert to so testify. Accordingly, as with Davis's sleep deprivation, physical abuse, and age claims, we affirm the denial of relief on this claim.

*Davis*, 990 So. 2d at 463-64.

Davis asserts that the state court's rejection of this claim was based on an unreasonable determination of facts; he makes no claim that the state courts resolved this issue contrary to, or by unreasonably applying, federal law. According to Davis, the facts

relied on by the state courts were rebutted by clear and convincing evidence, and the state courts overlooked the fact that Davis was on LSD at the time of his confession. Davis's postconviction expert testified that the effects of LSD only last for about twelve hours (App. B14/T18, 21), but the record, including Davis's testimony at the suppression hearing, supports the trial court's finding that Davis was in custody about fifteen hours before his confession (App. A3/514-16; A15/1480, 1521; App. B3/310, B14/T20). *See Davis*, 859 So. 2d at 472 (noting Davis had been in custody approximately fifteen hours before meeting with detectives). While Davis now claims he was only in custody about twelve hours before his confession (Am. Petition, p. 7), this assertion is not supported by the record. In addition, Davis's postconviction expert was not aware how much, if any, Davis had slept during that time, and suggested that he was sleep deprived (App. B14/T21-22, 41; see Am. Petition, p. 10). However, Davis testified at the suppression hearing that he was asleep most of the time between his arrest and talking to the detectives, and the trial court specifically found he was not sleep deprived (App. A15/1521, 1540; B3/310, 329).

Davis cannot meet his burden of refuting the state court's factual findings by the clear and convincing evidence standard simply by reciting testimony that was rejected by the factfinder below. The record fully supports the state court's findings on this issue. Davis's attorneys were well aware that Davis and his co-defendants had used LSD before their arrests, and offered a reasonable strategic decision against using an expert to support their pretrial claim that the *Miranda* waiver obtained by Davis was invalid (App. B15/T90-95, 102, 135-36). His new expert did not opine that Davis was unable to waive his *Miranda* rights,

but only testified that the LSD use should be taken into consideration in determining the validity of his waiver (App. B14/T20-22).

In addition, Davis has failed to allege prejudice. The state courts expressly found that, even if Davis's confession were suppressed, there was no reasonable probability of a different outcome at trial. Davis's failure to assert any prejudice or make any attempt to rebut the state court's conclusion that no prejudice could occur renders his claim insufficient.

Davis does not identify any deficiency in the state court fact-finding or legal analysis. He has failed to demonstrate that the state court determination of facts was unreasonable, or that the rejection of this claim was contrary to or an unreasonable application of *Strickland* or any other federal law. Davis is not entitled to relief on ground one.

**Ground Two**

**INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE
TO CHALLENGE PREMEDITATION AND *MIRANDA* WAIVER
DUE TO DRUG USE.**

Davis next asserts a Sixth Amendment claim of ineffective assistance of counsel due to trial counsels' failure to present expert testimony regarding his drug use prior to the crime and prior to his waiving his *Miranda* rights. Am. Petition, pp. 13-17; Memo, pp. 8-11.

The federal constitutional claim raised in ground two was exhausted in state court, and denied on the merits following an evidentiary hearing. See App. B23, pp. 16-23, 43-53 (Issues I, III in postconviction appellate brief); *Davis*, 990 So. 2d at 463-64, 467-68.

Davis is not entitled to relief on this claim. To the extent Davis claims that counsel should have presented an expert at the suppression hearing to demonstrate that Davis was

incapable of waiving his *Miranda* rights, this claim is fully explored in ground one, *supra*, and the analysis on that issue is incorporated for ground two.

Davis's claim that an expert also should have been presented to support a voluntary intoxication defense also is without merit. In affirming the denial of relief on that issue, the Florida Supreme Court quoted approvingly from the state trial court's findings:

> In Davis's third claim, he argues that counsel Traina was deficient for failing to present an expert to support his voluntary intoxication defense. Davis states that the testimony of his expert, Dr. Smith, establishes that LSD prevented him from forming the specific intent that first-degree murder requires. Davis therefore argues that Traina was deficient for failing to call a witness to substantiate his voluntary intoxication defense. As stated above, to establish ineffective assistance of counsel under *Strickland*, Davis must show that counsel was deficient and that this deficiency prejudiced him. The postconviction court denied this claim, stating:
>
> > At the evidentiary hearing, Dr. Smith repeatedly testified that Defendant's LSD ingestion would not negate his ability to plan or act purposefully. Dr. Smith testified that Defendant's actions would be based on "distorted perceptions." However, Dr. Smith could not testify as to what the distortions would be or give any specific information about the distortions.
> >
> > Trial counsel's performance in presenting the voluntary intoxication defense was not deficient. Trial counsel's testimony at the evidentiary hearing establishes that given the problems with the plausibility of the defense, counsel presented the defense as best he could. Trial counsel questioned the State's witness about Defendant's LSD use on the night of the murder. Additionally, he argued voluntary intoxication during closing argument and even received a voluntary intoxication jury instruction. . . . Additionally, trial counsel testified that if he had retained an expert, he was concerned that the State would learn damaging information about [Davis] when the State deposed the expert. . . . The record supports the conclusion that trial counsel made a strategic decision not to call an expert to testify about the voluntary intoxication defense and that the decision was reasonable under the circumstances. Furthermore, Dr. Smith's testimony that [Davis's] LSD use would not affect [his] ability to

plan and act purposefully would have negated the voluntary intoxication defense that trial counsel was able to present to the jury. Thus, it cannot be said that trial counsel's performance was deficient.

Postconviction Order at 18 (record citations omitted). We affirm the denial of relief on this claim.

First, competent, substantial evidence supports the postconviction court's finding that Traina made a strategic decision not to call an expert. The postconviction court noted that one of the reasons Traina did not call an expert was that Traina was afraid that the expert would learn things that incriminated Davis as a principal. Traina had good reason to fear Davis would make such comments to an expert, as Davis had made such comments to Traina. Traina stated that the defense's strategy was to portray Valessa as the murderer and Davis as just helping her after the fact. If Davis told an expert that he was involved in the crime itself and the State elicited such testimony at trial, it would directly contradict this defense strategy; in Traina's words, the expert would "blow up in his face." Traina considered retaining an expert and chose not to based on his assessment of the situation. This evidence supports the postconviction court's conclusion that Traina's decision was strategic.

Similarly, we find no error in the postconviction court's determination that Traina's strategic decision was reasonable. The strategy at trial was to portray Davis as involved only in the murder after the fact. Traina was concerned that the statements Davis had made to him would be the same statements that a retained expert would hear; those statements could incriminate Davis as a principal. Traina was concerned that the expert, when later deposed, would have to reveal the statements and thereby cripple their trial strategy. Accordingly, we agree that counsel's performance was not deficient.

Additionally, we find no error in the postconviction court's conclusion that Davis has not demonstrated that he was prejudiced by Traina's alleged deficiency. Dr. Smith's testimony would not have substantially helped Davis. Dr. Smith could not identify any particular hallucination or distortion that Davis had experienced when committing or planning the crime. He could only testify that it was "a definite possibility" that this crime would not have occurred but for Davis's LSD use. These statements about possibilities and unspecified distortions do not undermine our confidence in the outcome. *See Maxwell,* 490 So. 2d at 932 ("[T]he clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.").

Further, Dr. Smith's testimony could have hurt Davis. Dr. Smith noted that LSD "does not impair an individual's ability to make a plan, to act purposefully" and would not prevent someone from "form[ing] intent." These statements could have undermined the voluntary intoxication argument that Traina was able to make based on Whispel's testimony. Counsel will not be deemed ineffective for failing to present evidence that would be more harmful than helpful. *Johnson v. State, 921 So. 2d 490, 501 (Fla. 2005)* ("Counsel cannot be deemed ineffective for failing to present evidence that would open the door to damaging cross-examination and rebuttal evidence that would counter any value that might be gained from the evidence."). We affirm the denial of relief on this claim.

*Davis*, 990 So. 2d at 467-68. Thus, the state courts expressly found that defense counsel made a reasonable strategic decision against using an expert in support of a voluntary intoxication defense. These factual findings have not been disputed and provide ample support for the trial court's rejection of this issue. Davis, however, makes the conclusory claim that the state courts acted contrary to, or unreasonably applied, *Strickland* in denying this claim. The Florida courts expressly applied *Strickland* as the appropriate prevailing law, so they did not act contrary to established federal law. In addition, the rejection of this claim in state court was not an unreasonable application of *Strickland*.

The state court factual finding that counsel made a reasonable strategic decision on how to present the intoxication defense refutes any suggestion of deficiency. *See Rogers v. Zant*, 13 F.3d 384, 387-88 (11th Cir. 1994); *Stewart v. Sec'y, Dept. of Corr.*, 476 F.3d 1193, 1217 (11th Cir. 2007) (noting strategic decisions are afforded strong presumption of reasonableness). In this case, counsel articulated a reasonable explanation for the decisions made regarding presentation of the defense case. Counsel had evidence to support his theory that Davis's involvement was limited and that he was only acting at Valessa's direction. Davis was able to recall details of the murder, having recounted the

changing plans to kill Vicki Robinson, making a successful voluntary intoxication defense difficult. And while Davis was able to argue intoxication as an alternative based on Whispel's testimony about the LSD use, Davis's postconviction expert would have negated any help to the defense by his testimony that LSD use would not impair Davis's ability to plan or form the intent to kill.

In addition, Davis has not established or even adequately alleged any possible prejudice; he does not identify the appropriate standard or offer any analysis of the trial evidence presented below. No prejudice can be discerned where the facts of the case soundly refute any intoxication defense. *Harich v. Dugger*, 844 F.2d 1464, 1471 (11th Cir. 1988) (no prejudice for failing to present an intoxication defense which would have been rejected since facts of crime required significant degree of physical and intellectual skills). In this case, the evidence of premeditation was overwhelming, and the postconviction expert repeatedly conceded that ingestion of LSD would not eliminate a defendant's ability to plan or act purposefully (App. B14/T12, 23-24). There is no reasonable probability of a different outcome, had Smith testified at the trial.

Davis has failed to demonstrate that the Florida Supreme Court acted contrary to or unreasonably applied established federal law in its rejection of this claim. Davis is not entitled to habeas relief on ground two.

**Ground Three**

**ADMISSION OF DAVIS'S STATEMENTS TO LAW ENFORCEMENT VIOLATED *MISSOURI V. SEIBERT.***

Davis asserts that he is entitled to habeas relief due to a violation of his Fifth Amendment right to remain silent, as construed in *Missouri v. Seibert*, 542 U.S. 600 (2004). Am. Petition, pp. 17-23; Memo, pp. 11-16.

Ground three was exhausted in state court. In his direct appeal, Davis alleged that his motion to suppress should have been granted, claiming that admission of his post-arrest statements to law enforcement violated his Fifth Amendment right to be free from self-incrimination. See App. A23, pp. 22-26 (Point I in appellate brief). The Florida Supreme Court denied relief, applying *Orgeon v. Elstad*, 470 U.S. 298 (1985), and finding that the trial court properly concluded that Davis waived his *Miranda* rights voluntarily. *Davis*, 659 So. 2d at 471-72. In postconviction, Davis argued that *Missouri v. Seibert*, 542 U.S. 600 (2004),[4] decided following his direct appeal, established that his confession had been unconstitutional. See App. B23, pp. 23-43 (Argument II in appellate brief). Both the circuit court and the Florida Supreme Court reconsidered the claim under *Seibert*, avoiding the issue of whether Seibert should be applied retroactively, and determined that the *Miranda* waiver obtained in this case was not improper even if *Seibert* applied. *Davis,* 990 So. 2d at 464-66.

---

[4] In *Seibert, Miranda* rights were not given until 20 minutes after the police elicited a confession. The Court disapproved of the "question first" doctrine employed because it effectively thwarted the purpose of *Miranda*. Davis's conviction became final prior to the release of *Seibert.* As explained, *supra*, in ground three*, Seibert* is an application of the *Miranda* decision, not the establishment of a fundamental constitutional right which has been held to apply retroactively. *See Young v. State*, 942 So. 2d 980 (Fla. 4th DCA 2006)

This claim provides no basis for relief. Although Davis asserts that the state courts misapplied *Seibert*, that assertion does not support relief because *Seibert* was not the applicable United States Supreme Court law at the time his suppression issue was initially litigated. The writ of habeas corpus only provides relief for violations of constitutional rights that were clearly established as United States Supreme Court precedent at the time of the petitioner's trial. *Williams*, 529 U.S. at 390.

To the extent that Davis relies on *Seibert* as creating a new rule prohibiting a "question first" strategy, this Court must adhere to the retroactivity principles in *Teague v. Lane*, 489 U.S. 288 (1989). *Seibert* is not subject to retroactive application under *Teague*. Even if *Seibert* created a new procedural rule, that rule is not a "watershed" rule that implicates the fundamental fairness and accuracy of Davis's trial, as required by *Teague*. *See Bennet v. Terhune*, 265 Fed. Appx. 490, 493 (9th Cir. 2008) (unpublished) (retroactive application of *Seibert* precluded by *Teague)*; *Kendricks v. Sec'y., Dep't of Corr.*, USDC Case No. 8:06-cv-2159-T-24EAJ, 2008 WL 516706 at *6, (M.D. Fla. Feb. 22, 2008).

To the extent Davis is suggesting that *Seibert* demonstrates that the Florida Supreme Court unreasonably applied *Elstad*, the holding in *Bennet* is instructive:

> To the extent that Bennet is arguing that if *Seibert* did not constitute an applicable new rule, nonetheless it makes the state court's application of *Elstad* objectively unreasonable, we cannot agree. *Seibert* was a plurality opinion in which four justices of the Court concluded that *Elstad* compelled them to vacate the state Supreme Court's decision excluding a post-*Miranda* confession. *See Seibert*, 542 U.S. at 622-623 (O'Connor, J., dissenting, joined by Rehnquist, C.J., Scalia and Thomas, JJ.) ("We are bound by *Elstad* to reach a different result, and I would vacate the judgment of the Supreme Court of Missouri."). We cannot say that the state court in Bennet's case was "objectively unreasonable" when, on similar facts, it came to the same

conclusion that four justices of the Supreme Court came to in the later *Seibert* plurality.

*Bennet*, 265 Fed. Appx. at 493.

Finally, even if *Seibert* could be applied in this case, no constitutional error has been demonstrated, as the state courts properly found. In upholding the denial of relief on this claim, the Florida Supreme Court held as follows:

> In Davis's second claim, he argues that his confession was taken in violation of the *Fifth and Fourteenth Amendments to the United States Constitution* as applied in *Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004)*. Because *Seibert* was decided after Davis's proceedings, he urges us to apply *Seibert* retroactively.
>
> * * *
>
> The postconviction court denied relief on this claim, explaining: [E]ven if *Seibert* applied retroactively, it does not entitle Defendant to relief. In *Seibert*, the United States Supreme Court stated that "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Seibert, 542 U.S. at [611]*. The Florida Supreme Court considered the voluntariness of Defendant's confession on direct appeal and concluded that,
>
>> the circumstances surrounding Davis's warned confession properly 'cured' the condition that rendered the unwarned statement inadmissible. *[Oregon v. Elstad, 470 U.S. 298, 311, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985)]*. . . . The officers in no way attempted to downplay the significance of Davis's *Miranda* rights.
>
> *Davis*, 859 So. 2d at 472. Based on the Florida Supreme Court's reasoning under *Elstad*, which was the law in effect at the time of Defendant's direct appeal, analysis under *Seibert* would render the same result. It is reasonable to find that the warnings [Davis] received functioned "effectively" as *Miranda* requires.

Postconviction Order at 10-11. We agree with the postconviction court that our direct appeal decision in this case is consistent with the opinions of the majority of justices in *Seibert* and that application of *Seibert* would not result

in the suppression of Davis's confession. In *Seibert*, a plurality opinion, the United States Supreme Court held that when an officer intentionally questioned a suspect without giving *Miranda* warnings in order to elicit an unwarned confession and then used that unwarned confession to elicit a second warned confession, *Miranda* was violated. The plurality explained:

> "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires.

*Seibert, 542 U.S. at 611-12* (citation omitted) (quoting *Duckworth v. Eagen, 492 U.S. 195, 203, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989)).*

Concurring in result only, Justice Kennedy stated that he would apply a narrower test than the plurality. Instead of subjecting all question-first procedures to the plurality's test, he would apply that test "only in the infrequent case, such as [in *Seibert*], in which the two-step interrogation was used *in a calculated way to undermine* the *Miranda* warning." *Id. at 622* (Kennedy, J., concurring in the judgment) (emphasis added). Otherwise, Justice Kennedy stated that he would apply the Court's earlier decision in *Oregon v. Elstad, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985)*, as the four dissenters in *Seibert* stated they would do in all cases. *Seibert, 542 U.S. at 620* ("In my view, *Elstad* was correct in its reasoning and its result.") (Kennedy, J., concurring in the judgment); *id. at 628* ("I would analyze the two-step interrogation procedure under the voluntariness standards . . . reiterated in *Elstad*.") (O'Connor, J., dissenting, joined by Rehnquist, C.J., and Scalia and Thomas, JJ.).

On Davis's direct appeal, we held that "[t]he officers in no way attempted to downplay the significance of Davis's *Miranda* rights." *Davis, 859 So. 2d at 472*. Thus, we have already held that the officers did not use the question-first method "in a calculated way to undermine the *Miranda* warning," as Justice Kennedy required. Because this is not a situation where Justice Kennedy agreed the plurality's test would apply, *Elstad* applies, as the four dissenting justices and Justice Kennedy stated. We specifically relied upon *Elstad* on direct appeal and under it denied Davis's claim. *Davis, 859 So. 2d at 471-72*. Accordingly, Davis is not entitled to relief under *Seibert*.

Davis further maintains that we should not reject his claim based on our holding in *Davis* because he has brought pertinent facts to this Court's

attention that we were not aware of in his direct appeal. We disagree. The record does not support this claim, and despite repeated invitations to do so at oral argument, Davis's counsel could not identify any circumstances surrounding his confession of which this Court was unaware in *Davis*. Accordingly, we affirm the denial of this claim. [FN 9]

> [FN 9] Because Davis is not entitled to relief under even a retroactive application of *Seibert*, we do not decide whether *Seibert* should be retroactively applied.

*Davis*, 990 So. 2d at 464-66.

The state courts' factual finding that the detectives did not minimize the *Miranda* warnings is supported by the record, and entitled to deference under 28 U.S.C. 2254(e)(1). Davis fails to acknowledge this finding, but instead claims that the state courts failed to acknowledge the similarity with *Seibert* and failed to analyze the facts properly, allegedly creating a "rapport" exception to *Miranda*. He claims that the direct appeal comment that Davis only fully explained his involvement after signing the *Miranda* waiver is untrue and contrary to the testimony of Detective Iverson. However, Detective Iverson testified that the pre-Miranda discussion included Davis's giving vague statements about being involved in the crime, but that more details and greater information was provided in the post- *Miranda*, taped portion of the interview. (App. B16/213-14).

Davis does not assert that the state courts acted contrary to or unreasonably applied federal law in the rejection of this claim. While he suggests that the Florida Supreme Court's holding was inconsistent with *Seibert,* the state courts fully explained the factual distinction: in *Seibert*, there was a deliberate attempt to circumvent *Miranda*, which did not happen in Davis's case.

Moreover, any possible error in the admission of Davis's statements could not compel habeas relief, because it would be harmless under *Brecht;* in light of the abundance of other, independent evidence of Davis's guilt, including the eyewitness testimony of Jon Whispel and incriminating statements Davis made to other witnesses, the evidence of his confession could not have any substantial and injurious effect or influence on the jury verdict.  Davis is not entitled to habeas relief on ground three.

**Ground Four**

**INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE TO PRESENT EVIDENCE TO SUPPORT A VOLUNTARY INTOXICATION DEFENSE.**

Davis next asserts that he was denied the effective assistance of counsel at the guilt phase of his capital trial due to his attorneys' alleged failure to present evidence to support a voluntary intoxication defense. Am. Petition, pp. 23-28; Memo, pp. 16-18.

The federal constitutional claim raised in ground four was exhausted in state court, and denied on the merits following an evidentiary hearing. See App. B23, pp. 43-53 (Issue III in postconviction appellate brief); *Davis*, 990 So. 2d at 467-68.

Ground four is a restatement of ground two (alleging counsel was ineffective in failing to offer an expert in support of a voluntary intoxication defense, asserting an expert could have established that Davis's drug use rendered him unable to form the premeditation necessary to support a first degree murder conviction). Davis's allegations are fully addressed in ground two.

In sum, relief must be denied because (1) Davis's trial attorneys made a reasonable strategic decision against using an expert to support a voluntary intoxication defense; (2)

Davis has never established that expert testimony was available to show that his LSD use rendered him unable to premeditate, since his postconviction expert did not offer such testimony; and (3) there would be no reasonable probability of a different outcome had Davis's attorneys presented the postconviction expert's testimony on this point.

Davis has failed to demonstrate that the Florida Supreme Court acted contrary to or unreasonably applied established federal law in its rejection of this claim, and ground four does not warrant habeas relief.

### Ground Five

### INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE TO INTRODUCE VALESSA'S CONFESSION AT DAVIS'S TRIAL.

Davis asserts that his trial attorneys were ineffective because they failed to present evidence of co-defendant Valessa Robinson's confession for consideration by the jury at his trial. Am. Petition, pp. 28-32; Memo, pp. 18-22.

Davis exhausted ground five in state court. The state trial court denied the claim on the merits following an evidentiary hearing. See App. B23, pp. 54-58 (Issue IV in postconviction appellate brief); *Davis*, 990 So. 2d at 468-69.

Ground five provides no basis for relief. In rejecting this claim, the Florida Supreme Court held:

> In Davis's fourth claim, he alleges that counsel was ineffective for failing to introduce Valessa Robinson's statement at trial under *section 90.804, Florida Statutes* (1999). Davis argues that trial counsel should have established Valessa's unavailability by subpoenaing her and thereby forcing her to invoke her privilege against self-incrimination. Davis claims that this failure to establish her unavailability constituted ineffective assistance under *Strickland*. As stated above, the elements of ineffective assistance under *Strickland* are deficiency and prejudice.

The postconviction court denied this claim. The court began by noting Traina's testimony that he spoke to Valessa's attorney, who stated that if Valessa did testify it "certainly wouldn't be something that would be consistent with [Davis's] defense. It would be adverse to Adam Davis." Postconviction Order at 21. Traina testified that based on these statements, he concluded Valessa either would not testify if subpoenaed or, if she did, her testimony would be harmful to Davis. The postconviction court also noted that Traina stated that he could not have admitted Valessa's statement because Traina did not have the corroborating evidence that *section 90.804(2)(c)* required. *See § 90.804(2)(c), Fla. Stat.* (1999) ("A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement."). The postconviction court then concluded:

> Mr. Traina made a strategic decision not to subpoena Valessa Robinson to testify at [Davis's] trial and that decision was reasonable under the circumstances. Additionally, trial counsel testified that he had no corroborative information to have Valessa Robinson's statement admitted into evidence, which *Florida Statutes Section 90.804(2)(c)* requires. Thus, trial counsel's decision did not amount to ineffective assistance of counsel.

Postconviction Order at 22.

We affirm the postconviction court. Davis's argument in his instant brief is exclusively that counsel should have established Valessa's unavailability. The trial judge in Davis's original trial did not state or even discuss Valessa's unavailability as a basis for denying Traina's attempt to introduce Valessa's statements through the two officers who took her confession. Thus, Davis's claim is meritless. Additionally, as the postconviction court noted, Traina testified that he had no corroborative evidence with which to introduce Valessa's statement under the provisions Davis now cites. Davis has not alleged that any such corroboration exists. Because Davis has not established what Traina could have done differently to have the evidence admitted, he has not established that Traina was deficient. Accordingly, we affirm the postconviction court's denial of relief on this claim.

*Davis*, 990 So. 2d at 468-69.

Davis makes no attempt to analyze Florida state law on the admission of Valessa's

confession at his trial, he merely accuses trial counsel of being ignorant of what is the

proper law and therefore deficient. As the state courts determined that trial counsel's assessment of the law was correct, and that, factually, Valessa's confession was excluded because it could not be independently corroborated and not because there was any question as to her availability, no deficient performance has been shown. In addition, Davis does not acknowledge or address the fact that counsel considered issuing a subpoena for Valessa to testify, but after speaking with Valessa's attorney, counsel reasonably determined that this would not be in the best interest of the defense. (App. B15/T116-17, T126).

Davis has also failed to allege any sufficient prejudice. Although he asserts that admission of Valessa's confession would demonstrate to his jury that Valessa was a principal to the murder, this would not compel a different outcome at trial; he does not allege a reasonable probability that he would not have been convicted of first-degree murder or sentenced to death.

Davis has failed to demonstrate that the rejection of this claim in state court resulted from any unreasonable determination of facts or any unreasonable application of *Strickland*, or any other federal law. Thus, ground five does not warrant habeas relief.

**Ground Six**

**INCONSISTENT THEORIES OF PROSECUTION**.

Davis asserts that he is entitled to habeas relief because the State allegedly violated his right to due process by taking inconsistent positions in prosecuting Davis and co-defendant Valessa Robinson. Am. Petition, pp. 32-35; Memo, pp. 22-24.

Davis exhausted ground six in state court. He raised the claim in his motion for postconviction relief, and the state trial court denied the claim on the merits; the Florida Supreme Court affirmed this ruling on appeal. See App. B23, pp. 58-63 (Issue V in postconviction appeal); *Davis,* 990 So. 2d at 469-70. response to allegations:

Ground six does not warrant habeas relief. Davis has failed to identify a United States Supreme Court decision holding that due process is violated when the State changes prosecutorial theories among co-defendants. In fact, the Court "has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." *Bradshaw v. Stumpf*, 545 U.S. 175, 190 (2005) (J. Thomas, concurring). In *Stumpf*, the Court reversed a finding by the Sixth Circuit granting habeas relief due to the State's taking inconsistent positions with regard to the identity of the triggerman, finding the identity was immaterial to the conviction and therefore the prosecutorial inconsistency on that point did not require voiding *Stumpf*'s plea. *Id.*, at 187-88. Given the language in *Stumpf*, any finding of a due process violation based on changing prosecutorial theories would amount to a new rule, unavailable for consideration in this habeas case.

Even if such a rule could be adopted, the facts of this case would not support the finding of a due process violation. In *United States v. Dickerson*, 248 F.3d 1036, 1043-44 (11th Cir. 2001), the Eleventh Circuit considered a due process claim premised on inconsistent prosecutorial theories. The Eleventh Circuit determined that due process was only implicated by inconsistent theories when the State was required to change theories in order to pursue the later prosecution. In cases finding a due process violation, the

inconsistency in the subsequent prosecution was essential because the government could not have prosecuted the second defendant at all under the prosecutorial theory espoused at the first defendant's trial. Because Dickerson could have been prosecuted as a conspirator under the theory as asserted in his codefendant's earlier trial, the change of argument was not undertaken in order **to allow** the later prosecution and therefore due process was not implicated. *Dickerson*, 248 F.3d at 1044 (emphasis added). Similarly, in the instant case, both Davis and Valessa Robinson could be prosecuted under the principal theory regardless of which defendant actually stabbed Vicki Robinson. Therefore, due process was not violated by any alleged shift of prosecutorial theory relating to which defendant actually stabbed Vicki Robinson. *See also Loi Van Nguyen v. Lindsey*, 232 F.3d 1236, 1237 (9th Cir. 2000) (State's change of position as to who fired the initial shot did not violate due process, where theory of prosecution was voluntary mutual combat, rendering issue of who shot first irrelevant; prosecutor's arguments were consistent with the evidence presented in both trials, and there was no showing that prosecutor had falsified information or acted in bad faith).

Moreover, no change of prosecutorial theory occurred in this case. The Florida Supreme Court denied this claim as follows:

> In this claim, Davis argues that the State used inconsistent theories in the trials of Valessa and Davis, advocating in each trial that the respective defendant was the actual murderer. The postconviction court denied this claim in brief, stating:
>
>> [A] review of the State's opening and closing statements in Valessa Robinson's trial, as well as the direct examination of Jon Whispel in Valessa Robinson's trial, reveals that the State never argued that Valessa Robinson stabbed her mother. Rather,

> during Valessa Robinson's trial, the State maintained that Adam Davis had actually stabbed Vicki Robinson. Therefore, the State did not alternate between inconsistent theories of prosecution.

Postconviction Order at 22-23 (record citations omitted).

> We affirm the postconviction court's denial of this claim. A review of the record in Valessa's trial demonstrates that the State's theory was that Valessa was a principal to the murder of Ms. Robinson, not the primary perpetrator. In the State's opening statement, the prosecutor argued that Davis inflicted the final, fatal stab wounds. The State later called Jon Whispel to testify and elicited testimony showing that Davis committed the murder with Valessa's assistance. In closing arguments, the State continued its theme of Valessa as principal by making statements such as: "[Valessa] had Adam Davis wrapped right around her. He would do anything for her, anything. He did do anything for her. He murdered Vicki Robinson." The prosecutor also stated: "I want you to remember this. This is probably the most important law that applies to this situation, this principal instruction." The State consistently argued that Davis was the actual murderer and Valessa was a principal. Accordingly, we affirm the denial of this claim.

*Davis*, 990 So. 2d at 469-70.

A review of the relevant transcripts from the Valessa Robinson trial supports the state courts' finding that the theory of prosecution was consistent with Davis's trial (App. B11/1866-B13/2412). Davis does not acknowledge or address this factual finding, which is entitled to deference and defeats his claim.

Thus, this claim fails factually and legally. Davis is not entitled to habeas relief on ground six.

## Ground Seven

**INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: ALLEGED FAILURE TO ENSURE A PROPER MENTAL HEALTH EVALUATION AND TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE AT SENTENCING.**

Davis next asserts that he is entitled to habeas relief because his attorney allegedly failed to secure a proper mental health evaluation and failed to adequately investigate and present mitigating evidence at the penalty phase proceeding. Am. Petition, pp. 35-42; Memo, pp. 24-36.

Davis exhausted this issue in state court. The issue was litigated in postconviction and denied on the merits following an evidentiary hearing. See App. B23, pp. 63-76 (Issue VI in postconviction appellate brief); *Davis*, 990 So. 2d at 470-71.

Ground seven does not warrant relief. In rejecting Davis's claim that counsel was ineffective in investigating and presenting mitigating evidence in the penalty phase, the Florida Supreme Court held as follows:

> In Davis's sixth issue, he raises several conclusory subclaims centered on penalty-phase counsel Terrana's effectiveness. First, Davis argues that Terrana should have used Dr. Gamache to establish statutory and nonstatutory mitigation. Next, Davis argues that Terrana ineffectively prepared Dr. Gamache and that as a result, Dr. Gamache did not accurately testify about Davis's history. Finally, Davis argues that Terrana should have presented additional mitigation evidence.

> After analyzing the testimony at the evidentiary hearing, the postconviction court denied all of Davis's subclaims together, explaining:

>> The testimony elicited during the evidentiary hearing fails to support that Mr. Terrana was ineffective . . . . Dr. Gamache testified that he spoke with Mr. Terrana on several occasions and that had he needed additional information from Mr. Terrana, he would have requested it. Although Mr. Terrana did not discuss specific questions with Dr. Gamache, Mr. Terrana's decision was a strategic one. Dr. Gamache's testimony fails to support the argument that he should have been used to establish statutory and non-statutory mitigators. Additionally, Mr. Terrana was not ineffective for failing to prepare Dr. Gamache or using him to establish statutory and non-statutory mitigators. Mr. Terrana called five additional witnesses to testify on Defendant's behalf.

Defendant also states that he has secured witnesses who could testify regarding many relevant facts that could have been brought out during the penalty phase; however, the fact that Defendant's postconviction counsel presented two experts with "more favorable" reports during Defendant's evidentiary hearing does not render Mr. Terrana's performance deficient. *See Davis v. State, 875 So. 2d 359, 372 (Fla. 2003); Asay v. State, 769 So. 2d 974, 986 (Fla. 2000).* As such, Defendant is not entitled to relief as to [this claim].

Postconviction Order at 28-29. We affirm the postconviction court.

First, Davis argues that Terrana should have used Dr. Gamache to establish statutory and nonstatutory mitigation. The postconviction court noted that Dr. Gamache testified in Davis's penalty phase to much of the mitigation that Davis's postconviction experts emphasized. We agree with the postconviction court that Davis did not elicit testimony or introduce evidence at the evidentiary hearing demonstrating that Dr. Gamache should have established additional statutory or nonstatutory mitigation. Instead, the unrefuted testimony at the hearing was that Davis had no history of diagnosis or treatment for any psychological disorders. Additionally, when given psychological assessment tests by Dr. Gamache to address this weakness, Davis attempted to fake mental illness. Dr. Gamache testified at the evidentiary hearing that the results of Davis's tests suggested that Davis was "grossly [exaggerating] problems of a mental health and mental illness nature." Dr. Gamache told Terrana that he would have to present these damaging facts to the jury if he was called to testify as to mental mitigation. These facts demonstrate that Terrana's decision to use Dr. Gamache in only a limited fashion was both strategic and reasonable. Thus, Davis has not demonstrated that Terrana's use of Dr. Gamache was deficient, and we affirm the denial of this subclaim.

Next, Davis argues that Terrana ineffectively prepared Dr. Gamache. We disagree. Both Terrana and Dr. Gamache testified that they met several times and discussed aspects of Davis's case and how they would approach his defense. They also testified that they had experience working together from prior cases. Finally, the night before trial, Dr. Gamache thoroughly discussed Davis's history and case in a lengthy deposition. These facts do not support Davis's allegation that Terrana was deficient.

However, even assuming Dr. Gamache could have been more effectively prepared by counsel, Terrana testified that he had a strategic reason for not doing so--to avoid the risks inherent in a deposition. Terrana

testified that he was concerned that if he laid out questions in detail, Dr. Gamache would have to reveal them when Dr. Gamache was later deposed by the State. Terrana also believed that based on working with Dr. Gamache on several prior cases, they did not need to discuss such strategy. Finally, Dr. Gamache and Terrana both testified that they felt they had sufficient information going into the deposition and trial. The postconviction court found that Terrana's decision not to prepare Dr. Gamache in detail was a strategic decision. Competent, substantial evidence supports this finding. Given these circumstances, we agree that it was also reasonable of Terrana to act as he did. We affirm the denial of relief on this subclaim.

Finally, Davis argues generally that Terrana should have presented additional mitigation evidence. However, Terrana testified that it was his strategy to not inundate the jury with every fact from Davis's history. Terrana instead emphasized that Davis could be a productive, nonviolent inmate, and that society did not benefit from his execution. He called Dr. Gamache and five additional witnesses to support this strategy. We have rejected ineffective assistance claims in similar contexts where counsel focused on humanizing the defendant. *See, e.g., Rutherford v. State, 727 So. 2d 216, 222-23 (Fla. 1998)*. After a careful review of the record, we agree with the postconviction court that Terrana's performance was not deficient.

However, even if Terrana's performance was deficient, Davis has not established that he was prejudiced by it. Much of the evidence that Davis now alleges should have been introduced was testified to by Dr. Gamache in Davis's penalty phase. To establish prejudice, Davis had to show that counsel's ineffectiveness "deprived [him] of a reliable penalty phase proceeding." *Asay, 769 So. 2d at 985* (quoting *Rutherford, 727 So. 2d at 223*). Davis did not do so. Accordingly, we affirm the postconviction court's denial of relief on this final subclaim.

*Davis*, 990 So. 2d at 470-71.

Davis has not demonstrated that this holding is contrary to or an unreasonable application of federal law. He suggests that he has established ineffective assistance of counsel because he has identified mitigation which the jury never heard. However, the United States Supreme Court has never held that counsel must present all available

- 36 -

mitigating evidence in the penalty phase of a capital trial in order to be deemed to have performed reasonably.

Davis asserts that *Strickland* and *Wiggins v. Smith*, 123 S. Ct. 2527 (2003), were not satisfied in this case, alleging counsel did not adequately investigate mitigation. However, he again fails to acknowledge or address the state court findings and evidence refuting this claim. Davis's penalty phase counsel, Mr. Terrana, testified at the evidentiary hearing about his extensive investigation into mitigation. Terrana was a very experienced capital defender, having handled twelve to fifteen guilt phase trials and seven to ten penalty phase trials. (App. B15/T141). He has "won" every penalty phase he has tried, except for Davis's, which he "lost" by the slimmest of margins. (App. B15/T176).

Terrana testified that he routinely employs an expert as a starting point for any penalty phase and he retained Dr. Gamache for that role early in this case. (App. B15/T143). Terrana used Diana Fernandez as an investigator; she secured numerous records, maybe 100 different documents, including school records, disciplinary records, etc. (App. B15/T149-50). All of the records were provided to Gamache and Terrana and Gamache consulted many times (App. B15/T150-52). Terrana's practice was to use lengthy questionnaires, one for the expert and one for the investigator, outlining what they needed to do and what they needed to look for in general terms. (App. B15/T150). He would have done that in this case with Gamache and Fernandez (App. B15/T150). Davis has never identified a specific deficiency or alleged what further investigation he believes should have been conducted.

In *Wiggins*, the attorney had not investigated sufficiently to make a reasonable decision about what evidence was available for presentation; the Court did not hold that counsel was constitutionally deficient for deciding against the presentation of mitigation on tactical grounds. *See also Rutherford v. Crosby,* 385 F.3d 1300, 1315 (11th Cir. 2004) (rejecting ineffectiveness based on failure to present mitigating evidence, and distinguishing *Wiggins,* noting that the new mitigation in *Wiggins* was not counterproductive or inconsistent with the other mitigation offered while Rutherford's mitigation "would have come with a price").

Davis suggests that counsel should have presented additional mitigation, including (1) statutory mental mitigation that his ability to conform his conduct to the requirements of law was significantly impaired; (2) evidence about the extensive history of drug use, addictive behavior, and LSD consumption at the time of the murder; and (3) family background evidence of his neglectful and deprived background, including being surrounded by family members that drank or used illegal drugs on a regular basis. Davis's trial attorney had a great deal of experience in capital cases, and reasonably chose not to present mental mitigation or extensive evidence of Davis's drug use. Presentation of mental mitigation through the defense expert at trial would have led to unfavorable testimony, including the fact that Davis had attempted to feign serious mental illness when tested and had recited the facts of the murder in "bonechilling" detail.

As the Eleventh Circuit has repeatedly recognized, a decision against presenting mitigation relating extensive illegal drug use is entirely reasonable. *Stewart v. Sec'y, Dept. of Corr.,* 476 F. 3d 1193, 1217 (11th Cir. 2007); *Haliburton v. Sec'y, Dept. of Corr.*, 342

F.3d 1233, 1244 (11th Cir. 2003) ("[E]vidence [of substance abuse] can often hurt the defense as much or more than it can help"); *Crawford v. Head*, 311 F.3d 1288, 1321 (11th Cir. 2002) ("[S]uch evidence often has little mitigating value and can do as much or more harm than good in the eyes of the jury"); *Grayson v. Thompson*, 257 F.3d 1194, 1227 (11th Cir. 2001) (noting that emphasizing defendant's alcoholic youth and intoxication may have been damaging in the eyes of the jury).

At the sentencing, trial counsel presented testimony about Davis's having been abandoned by his birth mother and learning that his step-mother was not his "real" mother "around" the same time that he lost his father in a motorcycle accident. Although Davis now identifies additional family members who could have testified at the penalty phase, these individuals did not testify at the postconviction hearing, and Davis does not identify any significant mitigation they could offer. His failure to allege any substantial mitigation which was not heard by the jury defeats his current claim of ineffectiveness.

Case law has consistently recognized that an attorney has an obligation to make an appropriate decision about what evidence to present or not present. Here, counsel developed a penalty phase theory that humanized the defendant, and chose not to present "every little thing that ever happened," but only the significant life circumstances (App. B15/176-79). *See Housel v. Head*, 238 F.3d 1289, 1296 (11th Cir. 2001) (in rejecting similar claim of ineffectiveness, court notes reasonableness of counsel's decision against focusing on intoxication and substance abuse in mitigation); *White v. Singletary*, 972 F.2d 1218, 1225-26 (11th Cir. 1992) (acknowledging reasonableness of decision not to dwell on intoxication as mitigation).

The cases cited by Davis do not compel a finding of deficiency on the facts of Davis's case. Davis's is not a case where counsel was on notice of any potential line of mitigation which remained unexplored, or where the undiscovered abuse could have been revealed in documents or records for a reasonable attorney to find, as in *Wiggins*. The fact that Davis's attorneys presented an extensive case for sentencing easily distinguishes the cases he cites.

Even if some deficiency in performance could be identified from the evidence, Davis clearly cannot prevail on any showing of the necessary prejudice. *White v. Singletary*, 972 F.2d at 1223 (noting prejudice prong of *Strickland* can never be satisfied where petitioner has failed to indicate what information could have been discovered and how it would impact the State's case). Weighed against the heavy aggravating circumstances, Davis's mitigation is weak and inconsequential, even as buttressed in postconviction. This was an egregious case, clearly deserving of the ultimate punishment. The heinous, atrocious or cruel and the cold, calculated, and premeditated aggravating factors are considered two of the weightiest factors in the capital balancing equation. *See Larkins v. State*, 739 So. 2d 90, 92-95 (Fla. 1999). The additional mitigation offered in postconviction through Dr. Smith and Dr. Stevenson was not compelling, and adds nothing significant to the mitigation already weighed by the court at sentencing. On these facts, Davis has not shown there was an unreasonable application of *Strickland* and ground seven does not warrant habeas relief.

**Ground Eight**

**INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE TO PRESENT EXPERT EVIDENCE TO REBUT STATE'S AGGRAVATING FACTORS.**

Davis alleges trial counsel was ineffective for failing to present expert testimony to refute the State's assertion that the aggravating factors of heinous, atrocious or cruel (HAC) and cold, calculated and premeditated (CCP) applied to Mrs. Robinson's murder. Am. Petition, pp. 42-46; Memo, pp. 36-37.

Ground eight was exhausted in state court, at least to the extent that Davis criticizes his attorneys for failing to rebut the CCP factor.[5] The issue was presented to the state court in the postconviction motion, subjected to an evidentiary hearing, and denied; the denial of relief was upheld on appeal. See App. B23, pp. 76-83 (Issue VII in postconviction appellate brief); *Davis*, 990 So. 2d at 471-73.

Ground eight does not warrant relief. The Florida Supreme Court denied this claim as follows:

> In Davis's final claim, he argues that Terrana was ineffective for failing to rebut the CCP aggravator and establish the substantially diminished capacity mitigator. [FN 10] As in the prior claims, the standard for ineffective assistance is an analysis of deficiency and prejudice under *Strickland*.
>
> > [FN 10] We deny Davis's claim that an expert should have been used to establish the substantially diminished capacity mitigator because, as discussed above, Davis did not establish that additional mental mitigation was viable in his case.
>
> The postconviction court denied this claim, quoting at length from Terrana's testimony at the evidentiary hearing. In that testimony, Terrana explained that he did not have Dr. Gamache rebut the CCP aggravator

---

[5] Although Davis includes a reference to the HAC factor, his argument only addresses CCP. Any claim that trial counsel rendered ineffective assistance of counsel by failing to offer expert testimony to rebut HAC is unexhausted and procedurally barred.

because Dr. Gamache had been deposed the night before trial. Terrana stated that Dr. Gamache gave "at least 20 to 30 pages of [deposition testimony] which [we]re some of the most bone-chilling testimony from [Davis] to [Dr. Gamache] that you've ever heard." Postconviction Order at 31. Terrana was thus concerned that putting Dr. Gamache on the stand to testify to the CCP aggravator would have allowed the prosecutors to cross-examine Dr. Gamache on those thirty pages of negative testimony. Terrana believed that "[i]f that would have happened, there's no doubt in my mind . . . that the vote would have been 12-0 for death. And you may even [have] had the alternate[s] upset that they couldn't cast a vote for death." *Id.*

Based on Terrana's testimony, the postconviction court concluded that Terrana's decision was strategic. Competent, substantial evidence supports this finding. Several of Davis's statements to Dr. Gamache were revealed in Dr. Gamache's deposition, and many of these statements were potentially harmful to Davis's case. For example, Davis told Dr. Gamache that he choked Ms. Robinson into unconsciousness after Davis got angry when she said something negative about his father. Davis also told Dr. Gamache that he thought Valessa was joking when she proposed killing her mother but that Davis cooperated with Valessa's proposal because he thought that they would buy the heroin and then back out before using it on Ms. Robinson. He believed that he could then use the heroin for himself.

Terrana reasonably did not want the State to elicit this testimony from Dr. Gamache on the stand. Such testimony would further cement Davis's role in the murder in the mind of the jurors and would portray Davis as manipulative. Davis's ability to ascertain that Valessa was not serious and his ability to formulate a plan to play along in order to acquire heroin for his own use would also undercut any argument that Davis was impaired cognitively. "Trial counsel will not be held to be deficient when she makes a reasonable strategic decision to not present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony." *Gaskin v. State, 822 So. 2d 1243, 1248 (Fla. 2002)*. Thus, we agree with the postconviction court that Terrana's performance was not deficient. Finally, Davis has not demonstrated that Dr. Smith's testimony would have helped his case. Dr. Smith testified that he believed LSD use would preclude a finding that the CCP aggravator applied, but Dr. Smith expressly declined to state whether LSD prevented premeditation. Dr. Smith also testified that LSD use would not prevent an individual from planning things or forming intent to act. Dr. Smith also could not explain what perceptual or emotional distortions Davis suffered from that foreclosed application of the CCP aggravator. These facts undercut the strength of his testimony that CCP did not apply. For all of these

reasons, we conclude that Davis has not established prejudice. Accordingly, we affirm the postconviction court's denial of this final claim.

*Davis*, 990 So. 2d at 471-73.

Davis has failed to demonstrate that the state court rejection of this claim was unreasonable. Although he offers the conclusory assertion that the Florida Supreme Court's findings were contrary to the record, and that the state court unreasonably applied federal law, he offers no factual or legal analysis to support this assertion. Both state courts agreed that the record showed (1) trial counsel followed a reasonable strategy in declining to use the mental health expert to challenge CCP; (2) use of the expert in the manner now contemplated by Davis would open the door to damaging testimony; and (3) the new mental health expert did not provide credible evidence to rebut the CCP factor. These findings are supported by the evidence and entitled to deference. Davis is not entitled to habeas relief on ground eight.

## Ground Nine

### INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL: FAILURE TO ENSURE THAT THE JURY WAS ABLE TO FOLLOW THE LAW.

Davis alleges that his attorneys rendered ineffective assistance of counsel by failing to ensure that the jury was able to follow the law. Am. Petition, pp. 46-49; Memo, pp. 37-39.

This claim was not exhausted in state court. Although it was litigated in the state trial court in postconviction (Claim IV), and denied on the merits, the denial of the claim was not pursued on appeal of the denial of postconviction relief. See App. B23 (Davis's postconviction appellate brief). Because exhaustion requires presenting a claim to the

highest state court, the failure to present this claim to the Florida Supreme Court in Davis's postconviction appeal renders his claim unexhausted. As there is no avenue for further consideration of this claim in state court, it is procedurally barred and subject to summary dismissal. Davis has not shown cause and prejudice to overcome the procedural default and has not shown that a manifest injustice will occur if this Court does not reach the merits of the claims.

Even if considered on the merits, ground nine offers no basis for relief. In denying this claim, the circuit court entered factual findings which defeat any finding of ineffective assistance with regard to jury selection:

> As to Claim IV, Defendant argues that his counsel provided ineffective assistance of counsel when he failed to adequately ensure that the jury would be able to follow the law in violation of the Sixth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Florida Constitution. Defendant argues that counsel was unable to adequately and effectively question the venire.

> **Venireperson Pritchett**

> Defendant argues that counsel did not adequately and specifically inquire as to whether Mr. Pritchett could consider mercy as allowed by *Thomas v. State*, 403 So. 2d 371 (Fla. 1981). Defendant further alleges that counsel failed to perfect his objection to Mr. Pritchett and, therefore, was forced to use a peremptory strike when Mr. Pritchett should have been stricken for cause.

> However, a review of the record reflects Mr. Pritchett indicated that not every first degree murder warranted a death sentence, and it would "depend on the circumstances." (See November 1, 1999 transcript, V. 1, pp. 14, 18, attached). He further stated that he understood the process of weighing aggravators and mitigators, could consider arguments and evidence in favor of a life sentence, and could make a recommendation as to a life or death sentence, depending on the evidence presented at trial. (See November 1, 1999 transcript, V. 1, pp. 14-15, 18-19, attached). Accordingly, the Court finds there is no indication in the record that Mr. Pritchett would have been stricken

for cause had counsel continued to question him about mercy or perfected his objection. Moreover, the Court notes that counsel attempted to question Mr. Pritchett about mercy, but the trial court sustained the State's objection to such questioning. (See November 1, 1999 transcript, V. 1, p. 20, attached). Based upon the above, the Court finds Defendant has failed to show how counsel performed deficiently or how counsel's alleged deficient performance prejudiced the outcome of the proceedings. As such, no relief is warranted.

### Venireperson Mosier

Defendant argues that counsel was ineffective for inadequately questioning Mosier regarding mercy. However, as the Florida Supreme Court stated in Davis' direct appeal:

> Mosier's response did not unequivocally indicate that he would not consider evidence of mitigating factors or that he would not recommend a life sentence instead of the death penalty. In fact, Mosier had previously stated that he would be comfortable applying the law and recommending a life sentence if he determined that the mitigating factors proven by the defense outweighed the aggravating factors proven by the State. He further unequivocally stated that he accepted the idea of recommending a life sentence as opposed to death if Davis was convicted of first-degree murder.

*Davis*, 859 So. 2d at 474. Consequently, the Court finds Defendant has failed to show how counsel performed deficiently or how counsel's allegedly deficient performance affected the outcome of the proceedings. As such, Defendant is not entitled to relief as to Claim IV.

App. B7/1141-43.

The state court's factual findings that prospective jurors Pritchett and Mosier were not reasonably subject to being excused based on their responses during voir dire are supported by the record, and entitled to deference. Davis makes no showing to the contrary, and does not even assert that a more thorough questioning by defense counsel would have led to a cause excusal. Moreover, Davis has not shown prejudice because he has not shown that any reasonable jury would not have convicted Davis and recommended

the death penalty, on the facts of this case.   Ground nine does not warrant habeas corpus relief.

## Ground Ten

### PROPORTIONALITY OF DEATH SENTENCE.

Davis challenges the proportionality of his death sentence, claiming that co-defendant Valessa Robinson was equally culpable but was not sentenced to death. Am. Petition, pp. 49-51; Memo, pp. 39-41.

This claim was not exhausted in state court; in addition, it does not present a federal constitutional issue. Although the Florida Supreme Court considers the proportionality of every capital sentence before it, this review is in the context of determining the propriety of the sentence to ensure statewide uniformity in capital sentencing. Such review would not encompass the claim asserted here, that Davis's sentence is disproportionate because an equally culpable co-defendant received a lesser sentence. In this case, Davis never asserted a federal constitutional issue with regard to the proportionality of his sentence. See App. A23, B23 (appellate briefs).  Ground ten is unexhausted and procedurally barred. Davis has not shown cause and prejudice to overcome the procedural bar and has not shown that a manifest injustice will occur if this Court does not reach the merits of ground ten.

Even if considered on the merits, this claim must be summarily dismissed for failure to present a federal constitutional issue. Davis cites only Florida state cases and asserts that, "Under Florida law," his death sentence is invalid as disproportionate. Obviously, his failure to identify any federal law in support of his claim renders this issue insufficient; Davis

has not alleged that the state courts, which never considered the issue, ruled in a manner contrary to, or unreasonably applied, federal law.

To the extent that Davis claims that he was denied the opportunity to have his co-defendants' sentences considered by his jury as mitigation (Am. Petition, pp. 49-50), he is mistaken. Davis was permitted to argue his co-defendants' sentences as mitigation, and indeed did so. (App. A14/1378); Davis, 859 So. 2d at 477. Ground ten does not warrant habeas corpus relief.

### Ground Eleven

**APPLICATION OF AGGRAVATING FACTORS: HEINOUS, ATROCIOUS OR CRUEL AND COLD, CALCULATED AND PREMEDITATED.**

Davis contends that he should not have been sentenced to death because the aggravating factors of heinous, atrocious or cruel (HAC) and cold, calculated and premeditated (CCP) did not apply to the facts of this murder. Am. Petition, pp. 52-54; Memo, pp. 41-47.

Ground eleven was exhausted in state court, but only as a state law issue. Davis does not even present a federal constitutional issue in his present federal petition. Although Davis challenged the application of the HAC and CCP aggravating factors in his direct appeal, he relied solely on state law. See App. A23, pp. 40-49 (direct appeal brief). His habeas petition does not rely on any federal cases or any constitutional principles. The failure to assert any federal constitutional claim with regard to this issue renders this claim facially insufficient. To the extent that Davis relies on the postconviction testimony of Dr.

Smith and Dr. Stevenson or any **implicit** federal argument in support of this claim, any

such reliance is unexhausted and procedurally barred.

On the merits, ground eleven provides no basis for relief. Claims based solely on

state law are beyond the scope of federal habeas review. *Anderson v. Sec'y., Dept. of

Corr.,* 462 F.3d 1319, 1330-31 (11th Cir. 2006).

Moreover, relief must be denied because any rational factfinder would easily

conclude that both the HAC and CCP aggravating factors properly apply in this case. In

applying the HAC factor, the trial judge recited the following facts:

> The constitutional standards of this aggravator indicate the murder of the victim a conscienceless or pitiless and unnecessarily torturous to the victim. The facts of this case include acts perpetrated upon a conscious victim clearly involving foreknowledge of death, extreme anxiety and fear. The victim did not die a quick or painless death. According to the testimony of the co-defendant Jon Whispel, Dr. Lee Miller, and the Defendant's own taped confession, the victim suffered a prolonged, terrifying death, enduring several attempts to kill her.

> On the night of this offense, the victim confronted the defendant Jon Whispel, the Defendant and the victim's own daughter, Valessa Robinson, who is also a co-defendant in this case, in the daughter's bedroom of the victim's own home. The Defendant followed the victim out and into the kitchen where he placed the victim in a choke hold, almost to the point of unconsciousness. They struggled on the floor and the Defendant called for the victim's daughter to bring him a syringe of bleach while he sat on top of the victim. When she was unable to locate it, she came to the kitchen and held her mother down while the Defendant retrieved the syringe. Upon his return the Defendant made several attempts to inject the bleach into the victim's neck and finally the needle went into her neck. The two of them continued to hold the victim down waiting for the injection to kill her. After a couple of minutes the Defendant yelled "It's not working." The defendant Whispel then brought the Defendant's knife into the kitchen and left. By his own confession, the Defendant stabbed the victim several times, in the neck and in the back. Defendant Whispel heard the victim call out after which the victim's daughter and the Defendant, holding the bloody knife with blood on his hands, return to the bedroom. The Defendant washed his hands and the three of them began

to smoke cigarettes. At that point they heard the victim moaning. The Defendant responded that "The bitch won't die." He returned to the kitchen, stabbed the victim again and attempted to break her neck.

The medical examiner, Dr. Lee Miller, testified that the victim was alive throughout this event and that her throat was cut. She remained alive and conscious until she lost so much blood that her heart was no longer able to pump.

This murder was indeed conscienceless, pitiless and was undoubtedly unnecessarily torturous to the victim. Quite contrary to the Defendant's contention that there was no intent on the part of the Defendant to inflict any type of suffering or pain upon the victim, she died a prolonged painful and terrifying death suffering several different attempts to kill her. Imagine the fear and anxiety the victim consciously endured choking, injection of bleach, eventual multiple stabbing and then being left to bleed to death. There is no doubt that this murder was heinous, atrocious or cruel. This aggravating factor has been proved beyond a reasonable doubt.

App. A4/637-68) (sentencing order).

Davis does not dispute the factual support for application of this factor, he merely alleges that he did not intend to inflict pain or suffering, and he could not premeditate a plan due to his LSD use. The facts establish otherwise; Mrs. Robinson's murder was the culmination of an extended, brutal attack, and was well-planned in advance.

The application of CCP is also well-supported on this record. The following findings were entered by the trial judge to support the application of the CCP factor:

Cold meaning calm, cool reflection and not an act prompted by emotional frenzy, panic or a fit of rage. Calculated meaning the Defendant had a careful plan or prearranged design to commit the murder. Premeditated meaning heightened premeditation as defined as deliberate ruthlessness.

The plot to kill the victim was hatched at Denny's Restaurant by the Defendant, co-defendant Whispel and co-defendant Robinson, the victim's daughter. The victim did not approve of her daughter's relationship with the Defendant, but they wanted to find a way to be together. The plan was to inject the victim with a heroin overdose.

In order to accomplish their plan the trio left the Denny's on their bicycles and returned to the victim's residence. With apparent great caution so as not to wake the victim they pushed the victim's van out of the garage and down the street before they started it up. The Defendant drove and the trio set out to purchase a needle and heroin to kill the victim. Upon attempting to purchase the heroin the Defendant indicated that he wanted the drugs so he could "take someone's ass out." Although unable to obtain the heroin, the Defendant did get a needle. The three of them returned to the victim's home and again in order to avoid detection by the victim they parked the van down the street. They went inside the house to Valessa's room to continue to plot the murder. The Defendant instructed defendant Robinson to get some bleach and a glass, which she did and he proceeded to fill the syringe. After waiting enough time to smoke another cigarette, the Defendant and defendant Robinson went to the victim's bedroom to kill her. At that point the victim woke up, the two left the room and the victim was eventually killed in the kitchen.

The initial plan to kill the victim was thought out to make it appear to be a drug overdose. Notwithstanding that they were unable to obtain the heroin they modified the plan to use bleach. Then during the actual commission of the murder when the plan failed, the Defendant finally stabbed the victim.

Although prior to the discussion at Denny's there was no plan or talk of murder and taking into account that the defendants claim to be under the influence of LSD prior to and during the discussion of the plan, but from that point forward there was a continual course of conduct over several hours that would lead to the death of the victim. The facts of this case clearly establish that this murder was the result of a calm reflection, certainly not an emotional frenzy; a careful plan and prearranged design to kill; heightened premeditation which began several hours before the actual commission; and totally lacking of any pretense of moral or legal justification.

The aggravating factor has been proven beyond all reasonable doubt.

(App. A4/638-640).

As the Florida Supreme Court held in Davis's direct appeal, Florida case law fully

supports the application of these factors on the facts of this case. *Davis*, 859 So. 2d at 477-

79. Ground eleven does not warrant habeas relief.

### Ground Twelve

**DENIAL OF RIGHT TO CONFRONTATION: USE OF HEARSAY TO PROVE AGGRAVATING FACTOR.**

Davis asserts that he was denied a fair sentencing when the trial judge permitted the State to rely on hearsay evidence to establish the aggravating factor that Davis was on felony probation at the time of the murder. Am. Petition, pp. 54-56; Memo, pp. 47-48.

This claim was not exhausted in state court. Although it was litigated in the state trial court in postconviction, and denied on the merits, the denial of the claim was not pursued on postconviction appeal. See App. B23 (Davis's postconviction appellate brief). Because exhaustion requires presenting a claim to the highest state court, the failure to present this claim in Davis's postconviction appeal renders his claim unexhausted and procedurally barred; it is subject to summary dismissal.

Even if considered on the merits, this claim would not support habeas relief. Davis asserts that the State violated *Crawford v. Washington*, 541 U.S. 36 (2004), by using hearsay evidence to prove that he was on felony probation at the time of Mrs. Robinson's murder. However, Crawford was not established federal law at the time of Davis's appeal, and, as the United States Supreme Court has expressly held, it is not subject to retroactive application. *Whorton v. Bockting*, 549 U.S. 407, 421 (2007).

In addition, no timely objection to the State's use of hearsay in sentencing was offered, and, at any rate, the admission of this testimony did not violate *Crawford*. In *Crawford*, the State introduced a tape-recorded statement given by Crawford's wife to the police in order to rebut the defendant's claim of self-defense. Crawford's wife did not personally testify against Crawford at trial because of the State's marital privilege;

therefore, Crawford had no opportunity for cross-examination. The United States Supreme Court held that the admission of the tape-recorded statement violated the Confrontation Clause, ruling that out-of-court statements that fall within the classification of "testimonial" may not be admitted at trial, even if the trial court finds the statements to be reliable, unless the declarant is unavailable and there had been a prior opportunity for cross-examination.

The statements Davis now challenges are not encompassed within *Crawford*'s definition of testimonial evidence. Rather, they were certified copies of prior convictions, establishing that Davis was on probation at the time of this offense, offered only for sentencing purposes. Although *Crawford* left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" the Court did identify three categories of testimonial statements: (1) "ex parte in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and (3) statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52. As the challenged statements in this case were not testimonial, no *Crawford* violation occurred. *Horton v. Allen*, 370 F.3d 75, 84 (1st Cir. 2004), *cert. denied*, 543 U.S. 1093 (2005).

Finally, any possible error with the admission of this evidence would clearly be harmless under *Brecht,* precluding federal habeas relief. In addition to the "under sentence

- 52 -

of probation" aggravating factor, Davis's death sentence is supported by two additional, weighty factors: heinous, atrocious or cruel, and cold, calculated and premeditated. He has offered only minimal, insignificant mitigation in contrast to this heavily aggravated murder. Any possible hearsay violation would not have a substantial or injurious affect on his sentencing proceeding, and would not compel habeas relief.

Davis has failed to demonstrate that this issue is properly before the Court, that the Florida courts unreasonably applied established federal law, that he is entitled to consideration of *Crawford* in this case, or that any *Crawford* violation occurred at his trial.

Ground twelve does not warrant habeas relief.

### Ground Thirteen

**JURY ROLE AT SENTENCING DIMINISHED IN VIOLATION OF *CALDWELL V. MISSISSIPPI*.**

Davis asserts that he was denied a fair sentencing when the State and the trial judge minimized the jury's role in sentencing, contrary to *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Am. Petition, pp. 56-58; Memo, pp. 48-49.

This claim was not exhausted in state court. Although it was litigated in the state trial court in postconviction, and denied as procedurally barred and without merit, Davis did not pursue the denial of the claim on postconviction appeal. See App. B23 (Davis's postconviction appellate brief). Because exhaustion requires presenting a claim to the highest state court, the failure to present this claim in Davis's postconviction appeal renders his claim unexhausted and subject to summary dismissal. The trial court's finding of a procedural bar provides another basis for summary dismissal.

On the merits, ground thirteen does not warrant relief. Davis offers only the conclusory assertion that, in light of *Ring v. Arizona*, 536 U.S. 584 (2002), Florida's standard jury instructions now violate *Caldwell v. Mississippi*, 472 U.S. 320 (1985). No federal court has ever agreed with this proposition, and consequently there can be no federal law contrary to or unreasonably applied in the circuit court rejection of this issue as procedurally barred. Because Florida law remains unchanged after *Ring*, and because the standard jury instructions accurately describe the jury role at sentencing under Florida law, there can be no *Caldwell* violation in this case. *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (to establish error under *Caldwell*, a petitioner must show that comments or instructions "improperly described the role assigned to the jury by local law"). Davis does not identify a particular instructional deficiency, but merely cites *Ring* and *Caldwell.* As those authorities do not compel any relief, ground thirteen does not warrant habeas relief.

### Ground Fourteen

### DENIAL OF FAIR TRIAL: ADMISSION OF AUTOPSY PHOTOGRAPHS.

Davis asserts that he was denied a fair trial by the State's introduction of photographs, which Davis claims were inflammatory and prejudicial. Am. Petition, pp. 58-60; Memo, 49-50.

This claim was not exhausted as a federal constitutional issue in state court. Although Davis raised the claim in his direct appeal, and the Florida Supreme Court denied the claim on the merits, Davis did not cite any federal cases or assert any constitutional due process violation. See App. A23, pp. 36-38 (direct appeal brief); *Davis*, 859 So. 2d at 477.

Davis does not raise any federal constitutional issue; he does not cite any federal cases, but simply asserts that he was denied a "fair trail" because the admission of an autopsy photo[6] was unduly prejudicial and only served to inflame the jury. This is not even the appropriate standard for federal review. The relevant due process question is whether any error in the admission of the disputed photograph was of sufficient magnitude to deny a fair trial, and to deprive Davis of fundamental fairness. *Jacobs v. Singletary*, 952 F.2d 1282, 1296 (11th Cir. 1992).

Moreover, no error has been shown in the state court rejection of this state law claim. As the Eleventh Circuit has recognized, "graphic photographic evidence rarely renders a proceeding fundamentally unfair." *Jacobs*, 952 F.2d at 1296. Such evidence, if erroneously admitted, only deprives a defendant of fundamental fairness if the evidence was a "'crucial, critical, highly significant factor' in the [defendant's] conviction." *Id. (*quoting *Williams v. Kemp,* 846 F.2d 1276, 1281 (11th Cir. 1988)); *see also Futch v. Dugger*, 874 F.2d 1483, 1487-1488 (11th Cir. 1989). In *Jacobs*, the court denied a due process claim, noting that the evidence was used by the medical examiner to help explain his testimony; the disputed photo in this case was similarly used to assist the medical examiner.

The Florida Supreme Court denied this claim as follows:

> A trial court's ruling on the admission of photographic evidence will not be disturbed absent a clear showing of abuse of discretion. *Mansfield v. State, 758 So. 2d 636, 648 (Fla. 2000).* The record in this case indicates that the trial court did not abuse its discretion by admitting into evidence the autopsy photograph of Ms. Robinson.

---

[6] In his direct appeal, Davis challenged the admission of one autopsy photo. His habeas petition does not specifically identify which photographs he believes were improperly admitted at his trial.

The autopsy photograph of Ms. Robinson was introduced into evidence to assist the medical examiner in helping the jury understand the nature of her injuries and the difficulty he encountered while attempting to determine her cause of death. This Court has repeatedly upheld the admission of photographs when they are beneficial in explaining a medical examiner's testimony, the manner of death, or the location of the wounds. See, e.g., *Floyd v. State, 808 So. 2d 175, 184 (Fla. 2002); Pope v. State, 679 So. 2d 710, 713-14 (Fla. 1996); Larkins v. State, 655 So. 2d 95, 98-99 (Fla. 1995).* The record in this case supports that the photographs were an aid in explaining the examiner's testimony. Further, the trial court allowed the State the admission of only one photograph for this purpose, and that photograph was limited to only the portions of Ms. Robinson's body that the examiner needed assistance in describing. See *Floyd, 808 So. 2d at 184* ("While a trial court should exercise caution in admitting particularly gruesome photographs, and in limiting their numbers, such photographs may still be relevant."). We find no error.

*Davis*, 859 So. 2d at 477.

Davis does not cite any established federal law that was ignored, overlooked or misapplied in the state court rejection of this claim. His argument is facially insufficient, ground fourteen does not warrant habeas relief.

### Ground Fifteen

### CONSTITUTIONALITY OF FLORIDA'S DEATH PENALTY.

Davis asserts that Florida's death penalty scheme is unconstitutional. Am. Petition, pp. 60-62; Memo, pp. 50. Ground fifteen was partially exhausted in state court. To the extent Davis asserts that Florida's death penalty statute is unconstitutional because it allegedly lacks sufficient appellate review, precludes consideration of mitigation, or fails to provide sufficient guidance on the consideration of mitigation (Memo, p. 50), this claim was presented in Davis's direct appeal, and denied on the merits. See App. A23, pp. 51-73 (direct appeal brief); Davis, 859 So. 2d at 479-80. The Florida Supreme Court rejected this

claim, citing prior case law where the same arguments had previously been denied. As no federal cases have found Florida's capital sentencing procedures to be unconstitutional, the state court could not have ignored, overlooked, or misapplied any federal law in the rejection of this claim, to the extent it was exhausted on direct appeal. To the contrary, numerous United States Supreme Court decisions uphold the validity of Florida's death penalty. *Spaziano v. Florida*, 468 U.S. 447, 464 (1984); *Barclay v.Florida*, 463 U.S. 939 (1983);, 432 U.S. 282 (1977); *Proffitt v. Florida*, 428 U.S. 242 (1976).

## EIGHTH AMENDMENT LETHAL INJECTION CLAIM

To the extent that Davis now claims lethal injection is a method of execution that violates the Eighth Amendment's prohibition on cruel and unusual punishment, this claim has not been presented to the state courts, and is unexhausted and procedurally barred. Am. Petition, p. 60.

Furthermore, on the merits, the claim does not warrant habeas relief. An array of standards gauges the risk sufficient for a lethal injection protocol to violate the Eighth Amendment's prohibition against cruel and unusual punishment. A number of courts use a "substantial risk" standard. *See, e.g., Baze v. Rees*, 217 S.W.3d 207, 209 (Ky. 2006) (holding that a method of execution constitutes cruel and unusual punishment if "a substantial risk of wanton and unnecessary infliction of pain, torture, or lingering death" necessarily arises), *cert. granted*, 551 U.S.1192 (2007), *aff'd, Baze v. Rees*, 128 S. Ct. 1520 (2008) (neither the risk of improper administration of the initial drug nor the state's failure to adopt an allegedly more humane alternative rendered the three-drug protocol a cruel and unusual punishment); *Taylor v. Crawford*, 487 F.3d 1072, 1080 (8th Cir. 2007)

("If Missouri's protocol as written involves no inherent substantial risk of the wanton infliction of pain, any risk that the procedure will not work as designated in the protocol is merely a risk of accident, which is insignificant in our constitutional analysis."); *LaGrand v. Stewart*, 173 F.3d 1144, 1149 (9th Cir. 1999) (holding that the district court's findings of "extreme pain, the length of time this extreme pain lasts, and the substantial risk that inmates will suffer this extreme pain for several minutes require the conclusion that execution by lethal gas is cruel and unusual").

*Morales v. Hickman,* 415 F. Supp.2d 1037 (N.D. Cal.), *aff'd,* 438 F.3d 926 (9th Cir.), *cert. denied*, 546 U.S. 1163 (2006), declares that the governing issue is whether the lethal injection protocol, as administered in practice, creates an undue and unnecessary risk of an inmate's suffering pain so extreme as to offend the Eighth Amendment. However, other courts use different standards, including "an undue and unnecessary risk," a "foreseeable risk," and a "constitutionally significant risk." Others use the "deliberate indifference" standard, although a review of United States Supreme Court precedent demonstrates the standard is confined to assessment of prison conditions, not executions.

*Ventura v. State,* 2 So. 3d 194 (Fla. 2009), which holds explicitly that Florida's lethal injection execution protocol conforms to Eighth Amendment stricture, states:

> We have repeatedly and consistently rejected Eighth Amendment challenges to Florida's current lethal-injection protocol. *See Tompkins v. State*, 994 So. 2d 1072, 1080-82 (Fla. 2008); *Power v. State*, 992 So. 2d 218, 220-21 (Fla. 2008); *Sexton v. State*, 33 Fla. L. Weekly S686, S691 (Fla. Sept. 18, 2008); *Schwab v. State*, 995 So. 2d 922, 924-33 (Fla. 2008); *Woodel v. State*, 985 So. 2d 524, 533-34 (Fla.2008), *cert. denied*, ___ U.S. ___, 129 S. Ct. 607, ___ L.Ed.2d ___ (2008); *Lebron v. State*, 982 So. 2d 649, 666 (Fla. 2008); *Schwab v. State,* 982 So. 2d 1158, 1159-60 (Fla. 2008); *Lightbourne v. McCollum,* 969 So. 2d 326, 350-53 (Fla. 2007). In his post-conviction motion

and brief to this Court, Ventura has simply re-alleged the criticisms of Florida's revised protocol that Lightbourne and his expert, Dr. Heath, presented in 2007. *See Lightbourne*, 969 So. 2d at 347-49. Ventura has not presented any allegations beyond those of *Lightbourne* and *Schwab* (who predicated his claims upon those of Lightbourne).

This Court has thus previously rejected each of these challenges to Florida's lethal-injection protocol and--based upon the sound principle of stare decisis--we continue the same course here. *See, e.g., Lightbourne*, 969 So. 2d at 349-53; *Schwab,* 969 So. 2d at 321-25. As we stated in *Schwab,* "Given the record in *Lightbourne* and our extensive analysis in our opinion in *Lightbourne v. McCollum*, we reject the conclusion that lethal injection as applied in Florida is unconstitutional." *Schwab,* 969 So. 2d at 325.

ii. *Baze* Does Not Require Reconsideration of *Lightbourne* and Related Decisions

The only "new" contention Ventura presents is that our recent lethal-injection decisions, including *Lightbourne*, have not applied the standard articulated by the *Baze* plurality. However, Ventura overlooks that we explicitly held in *Lightbourne*:

> In light of the[ ] additional safeguards [present in the August 2007 lethal-injection protocol] and the amount of the sodium <u>pentothal</u> used, which is a lethal dose in itself, we conclude that [the petitioner] has not shown a substantial, foreseeable or unnecessary risk of pain in the DOC's procedures for carrying out the death penalty through lethal injection that would violate the Eighth Amendment . . . .

969 So. 2d at 352-53. (footnote omitted) (emphasis supplied). Our analysis thus provided that Florida's current lethal-injection protocol is constitutional under either a substantial-risk, foreseeable-risk, or unnecessary-risk standard. This Court also recently observed in *Tompkins* that "we have rejected contentions that *Baze* set a different or higher standard for lethal injection claims than *Lightbourne*." 994 So. 2d at 1081. We now take this occasion to explain why this is so.

The disjunctive phrasing of our holding in *Lightbourne* has proven prescient because the United States Supreme Court has not yet adopted a majority standard for determining the constitutionality of a mode of execution. *See generally Baze v. Rees*, ___ U.S. ___, 128 S. Ct. 1520, 170 L.Ed.2d 420 (2008). Specifically, the *Baze* plurality adopted a version of the

substantial-risk standard, while Justice Breyer, concurring in the judgment, and Justices Ginsburg and Souter, dissenting, adopted a version of the unnecessary-risk standard. *See id.* at 1525-38 (Roberts, C.J., joined by Kennedy and Alito, JJ.); *id.* at 1563-67 (Breyer, J., concurring in the judgment); id. at 1567-72 (Ginsburg, J., dissenting, joined by Souter, J.). In contrast, Justices Thomas and Scalia renounced any risk-based standard in favor of a rule of law that would uphold any method of execution which does not involve the purposeful infliction of "pain and suffering beyond that necessary to cause death." *Id.* at 1556-63 (Thomas, J., concurring in the judgment, joined by Scalia, J.). Justice Stevens did not provide a separate standard but, instead, expressed general disagreement with (1) the death penalty based upon his long experience with these cases and the purported erosion of the penalty's theoretical underpinnings (deterrence, incapacitation, and retribution), and (2) the allegedly unnecessary use of the paralytic drug pancuronium bromide. *See id.* at 1542-52 (Stevens, J., concurring in the judgment).

Hence, the *Baze* Court did not provide a majority opinion or decision. In turn, this lack of consensus has complicated our duty to interpret article I, section 17 of the Florida Constitution "in conformity with the decisions of the United States Supreme Court" concerning the Eighth Amendment's bar against "cruel and unusual punishments." Under normal circumstances, we would resort to the "narrowest grounds" analysis presented in *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L.Ed.2d 260 (1977), which provides that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S. Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion)). However, there are no reliable means of determining the "narrowest grounds" presented in *Baze* because three blocks of Justices provided three separate standards for determining the constitutionality of a mode of execution. We addressed this issue in *Henyard v. State*, 992 So. 2d 120 (Fla. 2008):

We have previously concluded in *Lightbourne* and *Schwab* that the Florida protocols do not violate any of the possible standards, and that holding cannot conflict with the narrow holding in *Baze*. Furthermore, we have specifically rejected the argument that Florida's current lethal injection protocol carries "a substantial, foreseeable, or unnecessary risk of pain." *Lightbourne,* 969 So. 2d at 353. Accordingly, we reject

> [appellant's] argument [that we should reconsider *Lightbourne* and *Schwab* in light of *Baze]*.

Id. at 130 (emphasis supplied).Consequently, Florida's current lethal-injection protocol passes muster under any of the risk-based standards considered by the *Baze* Court (and would also easily satisfy the intent-based standard advocated by Justices Thomas and Scalia).

We also recently upheld and adopted a trial court's analysis concluding that Florida's lethal-injection protocol is "substantially similar" to that of Kentucky. *See Schwab*, 995 So. 2d at 924-33. This holding brings Florida's lethal-injection protocol squarely within the safe harbor created by the *Baze* plurality. *Baze,* 128 S. Ct. at 1537 (Roberts, C.J., joined by Kennedy and Alito, JJ.) ("A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard." (emphasis supplied)); *see also Baze*, 128 S. Ct. at 1569-71 (Ginsburg, J., dissenting, joined by Souter, J.) (favorably contrasting Florida's consciousness assessment with that of Kentucky and strongly indicating that even the *Baze* dissenters would have approved Florida's current lethal-injection protocol under an Eighth Amendment analysis).

In its current form, Florida's lethal-injection protocol ensures unconsciousness through a pause between the injection of a lethal dose of sodium <u>pentothal</u> (a potent coma-inducing barbiturate) and the injection of the second and third drugs, during which time the warden engages in a thorough consciousness assessment (brushing the condemned's eye lashes, calling the condemned's name, and shaking the condemned). Further, we have held that the condemned inmate's lack of consciousness is the focus of the constitutional inquiry. *See generally Lightbourne,* 969 So. 2d 326 (repeatedly stressing the significance of the undisputed fact that a sufficient dose of sodium pentothal renders the condemned unconscious and that this lack of consciousness precludes the perception of any pain associated with the later injection of <u>pancuronium bromide</u> and potassium <u>chloride)</u>.

*Ventura v. State*, 2 So. 3d at 197-201 (footnotes omitted) (emphasis included).

Adams fails to establish, based on controlling federal law, that lethal injection is a method of execution that violates the Eighth Amendment's prohibition on cruel and unusual punishment. Ground fifteen does not warrant habeas corpus relief.

Accordingly, the Court orders:

That Adams's petition for writ of habeas corpus is denied. The Clerk is directed to enter judgment against Adams and to close this case.

## CERTIFICATE OF APPEALABILITY AND

## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ··· only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further, ' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances. Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on October 15, 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Counsel of Record